THE SEYMOUR MANUFACTURING COMPANY *vs.* THE DERBY MANUFACTURING COMPANY.

Third Judicial District, Bridgeport, October Term, 1919.
PRENTICE, C. J., WHEELER, BEACH, GAGER and CASE, Js.

The parties having had certain business relations of a somewhat like character between them, on January 29th, 1917, entered into a written contract (Exhibit A), which provided, in substance, that they should thereafter co-operate in making copper bands for projectiles or shells, upon such orders or proposals therefor as might be mutually acceptable to them; that the plaintiff should make the bid, or accept the proposal, in its own name, turning over one half of the tonnage involved to the defendant for production in its plant; that the plaintiff should purchase and supply the defendant with the copper required in the making of its share of the bands, at the market price of the article on the day when the order, or proposal, for the bands was accepted; that the copper so delivered to the defendant should remain the property of the plaintiff, but should be billed and charged by the plaintiff to the defendant at the market price aforesaid, and the defendant should return to the plaintiff an equal amount of copper (less a manufacturing loss not exceeding one quarter of one per cent) in the form of copper bands and in heavy and light scrap, the scrap being

Seymour Mfg. Co. *v.* Derby Mfg. Co.

returnable "forthwith " after the manufacture of the bands, and at stated prices which were slightly less than the agreed market price of the copper furnished. The price for which the copper bands were sold per pound, in any given case, less the market price per pound of the copper used in making them, constituted the "toll " or manufacturing charge, eleven fifteenths of which was to go to the defendant for the bands made by it and four fifteenths to be retained by the plaintiff. This agreement remained in force until April 20th, 1917, when it was terminated by mutual consent. In an action based upon it, each party claimed damages for alleged breaches of its provisions by the other, and the pleadings were voluminous and complicated; but the case was tried as if it were an equitable suit for an accounting. The plaintiff had judgment for $180,296, with interest from April 30th, 1917, and the defendant appealed. *Held:—*

1. That the defendant's contention that the contract was illegal, because entered into for the purpose of restraining competition between the parties, was not only unsupported by the terms of the contract itself, but was refuted by the finding of facts.

2. That the copper taken over by the plaintiff from the defendant and used for the first bands made under the co-operative agreement (clause 12), about 651,000 pounds, was to be charged against the plaintiff at the prices paid by the defendant for the different shipments comprising that quantity, and not at the higher, average, price of the whole lot, 850,000 pounds, which the plaintiff would have taken over had the terms of Exhibit A been fully carried out according to the original intent of the parties; but that in making this computation the plaintiff was not entitled to the benefit of the one half of one per cent discount which the defendant had received for its cash payment for such copper. (*One judge dissenting.*)

3. That the clause (13th) of Exhibit A which required the plaintiff to furnish 500,000 pounds of copper to the defendant to enable it to fill an order for bands already taken by it (Chase contract, six inch), was not to be construed as calling for 500,000 pounds of copper *in bands*, as contended by the defendant, since it appeared from the express terms of this clause that such delivery was "in satisfaction of 500,000 pounds of copper which under a previous agreement " between the parties "was to be delivered to the Derby Company."

4. That an additional 180,500 pounds of the plaintiff's copper having been used by the defendant in filling the Chase six inch contract, without any agreement with the plaintiff as to its price, the latter was properly allowed its reasonable worth or market value at the time of its appropriation by the defendant.

5. That the plaintiff was entitled to its agreed toll on 73,830 additional

Seymour Mfg. Co. *v.* Derby Mfg. Co.

bands made by the defendant under an option forming part of the Chase contract, which was exercised by the purchaser, but the manufacture of which was concealed by the defendant from the plaintiff, who stood ready and willing to supply all the copper therefor, although the defendant did not in fact use the plaintiff's copper for making these particular bands; since the defendant had no right to resort to other sources of copper supply in order to make itself the sole beneficiary of the Chase option.

6. That the so-called Chase eight inch contract was a co-operative undertaking, and that the division of the toll for bands made under it was controlled by the 9th clause of Exhibit A.

7. That the delay of the plaintiff in answering a letter of the defendant wherein the latter proposed a new and different apportionment of the toll with reference to the Chase eight inch contract, was immaterial, and could not operate to divest the plaintiff of its rights acquired under Exhibit A.

8. That money paid by the plaintiff to the defendant for making bands before the execution of Exhibit A, which proved to be defective and were afterward returned by the purchaser to the plaintiff and scrapped as confessedly worthless, was properly allowed as a charge in the plaintiff's account, as the defendant could not in equity and good conscience retain moneys so paid to it; but that the defendant was under no legal obligation to instruct the plaintiff as to what disposition the latter should make of these defective bands, and therefore was not properly chargeable with a loss sustained by the plaintiff and due to a fall in the price of copper scrap while awaiting the defendant's inspection of the bands and its admission that they were defective.

9. That inasmuch as the defendant finally admitted on cross-examination that it had sold 242,000 pounds of copper scrap, only 83,000 pounds of which was produced from copper owned by it, thus falsifying its own report of the weights of copper scrap returned by it to the plaintiff, the latter was properly allowed to amend its bill of particulars and enlarge its claim for copper unaccounted for, and was not estopped from so doing because it had theretofore accepted the defendant's reported weights as correct.

10. That the method of computing the amount or quantity of copper unaccounted for, followed by the trial court, was apparently unobjectionable.

11. That the finding that the defendant used 60,000 pounds of the plaintiff's copper in filling a certain order, was sustained by the evidence to the extent of 46,616 pounds, but no further; and that the plaintiff's allowance for copper unaccounted for should be reduced accordingly.

12. That the charge for differential on scrap copper returned by the defendant was erroneous, in that it ignored the agreed manu-

facturing loss of one quarter of one per cent, and that the judgment should be corrected accordingly on the data supplied by the record.

13. That if any error was committed in treating all scrap returned as having been made under a previous contract, the error was harmless so far as the defendant was concerned, as it was charged therefor at a less rate per pound than it would have been if the calculation had been made upon the basis of the differential prescribed in Exhibit A.

14. That under clause eleven of Exhibit A the defendant was chargeable at the rate of one and three quarter cents per pound on scrap produced on a certain contract for bands made before the execution of Exhibit A, and not at the higher rate therein prescribed.

15. That the plaintiff's claim for damages due to the defendant's delay in returning scrap was not waived by the plaintiff merely by its acceptance of the scrap as it was returned without questioning the weights, inasmuch as it also appeared that such delay was the subject of repeated protests by the plaintiff, and that its prompt return was understood by both parties to be a matter of great importance to the plaintiff in order that it might put the scrap to use again as soon as possible and thus avoid purchasing additional copper; nor was such claim waived, as a matter of law, because it was not included in the original statement of claim presented to the defendant before suit; and that the necessary implication of the finding, that this claim had not been waived, if it were to be regarded as a question of fact, was one based upon conflicting evidence, and if regarded as a conclusion of law, was not erroneous.

16. That the record furnished no basis for the defendant's contention that the trial court allowed the plaintiff to recover the value of scrap which was not returned, and also damages for the defendant's delay in returning the same scrap: that the two remedies applied to different quantities of copper.

17. That in this case the measure of damages for the defendant's delay in returning the scrap was not the difference between the market value of the detained scrap on January 29th, when Exhibit A was executed, and the market price on March 7th of the ·substitute copper which the defendant was then compelled to buy, but the value to the plaintiff of the use and possession of the detained copper during the period of its wrongful detention; and that inasmuch as it was alleged and proved that one anticipated consequence of the plaintiff's loss of the use of the detained scrap would be the expense of procuring a temporary substitute, the amount of the loss resulting to the plaintiff from such temporary investment was recoverable as damages for the defendant's delay in returning the scrap. (*Two judges dissenting.*)

18. That in stating the account to determine the fact and amount of such damage, the defendant was to be debited with the price of the substitute copper (618,252 pounds) bought by the plaintiff on March 7th, and credited with each shipment of scrap returned at the market price of billet copper on the day of its return, until the whole 618,252 pounds had been credited.

19. That the finding of the trial court that the defendant had acquiesced in the cancellation of an uncompleted order for bands which had been sublet to it by the plaintiff, and therefore was not entitled to damages for such cancellation, was made upon conflicting evidence and hence must stand.

20. That under clause four of Exhibit A, and the uniform practice of the parties to allot orders in their entirety to one plant or the other and not to split or divide any of them, the provision for an equal division of production must be construed as applicable to the aggregate tonnage involved and not the tonnage of each particular order or contract taken; and that inasmuch as the defendant had already been allotted more than its agreed share of the total tonnage when six certain orders were taken and retained by the plaintiff, the defendant had no right to participate in any one of them; and that if the plaintiff did not inform the defendant of these orders, that breach of its obligation was *damnum absque injuria.*

Argued October 28th, 1919—decided March 5th, 1920.

ACTION to recover damages for the alleged breach of a manufacturing contract, brought to and tried by the Superior Court in New Haven County, *Webb, J.;* facts found and judgment rendered for the plaintiff for $192,015, and appeal by the defendant. *Error in part.*

The action was commenced by the common counts, and a substitute complaint in six counts was filed, to which a seventh count was afterward added. The first count is for items of indebtedness arising under a written contract, Exhibit A, dated January 29th, 1917; the second is the common counts, and the bill of particulars contains practically the same items as before stated in the form of a ledger account; the remaining counts are for consequential damages or loss of profits arising out of alleged specific breaches of Exhibit A. Out of this complaint grew a complicated

mass of pleadings covering more than one hundred and thirty printed pages of the record. The action was finally tried as if it were an equitable action of account joined with cross actions for breaches of contract, and supplemented by a bill and cross-bill for the reformation of Exhibit A. Judgment was rendered for the plaintiff for $180,296.63 with interest from April 30th, 1917.

The numerous controversies litigated arise out of the manufacture of copper bands for projectiles. Defendant, with plaintiff's financial aid, built a plant adapted to the manufacture of these bands, and began operations with orders turned over to it by the plaintiff. It also attempted to go into business on its own account, but was unable to finance the purchase and carrying of copper, and turned to plaintiff for assistance. In January, 1917, the contract in question, Exhibit A, was negotiated and executed on January 29th. As reformed by the trial court, it is printed in the footnote, the amendments being in italics.

---

Memorandum of working agreement made in duplicate this 29th day of January, 1917, between The Derby Manufacturing Company, at Derby, Connecticut, and The Seymour Manufacturing Company, at Seymour, Connecticut.

The parties hereto, in consideration of the mutual engagements hereinafter expressed, enter into the following arrangements and agree as follows:—

1. The Derby Manufacturing Company and The Seymour Manufacturing Company will hereafter during the continuance of this agreement co-operate in the production and supplying of copper driving. bands, on contracts or orders for such, in the sizes from 5″ to 9.2″ inclusive, on the basis of both companies joining therein to the extent and as hereinafter set out, the Seymour Company providing and carrying the copper, and The Derby Manufacturing Company manufacturing the bands therefrom to the extent hereinafter provided.

2. Whenever either company shall receive or obtain information that copper bands as above are desired, or that business is impending for such bands in any of the above sizes, full information will be forthwith given thereof to the other company, and upon its being proposed to submit any price or bid or accept any offer, and the Seymour Com-

This contract remained in force until April 20th, 1917, when it was terminated by mutual consent.

pany ascertaining that it can arrange for the copper and have same specified in the form and deliveries required for the business proposed—the companies having agreed upon a price for the bands, and so forth, the Seymour Company is to make the bid that the companies agree on or accept the proposal, and any order or contract awarded is to be taken by the Seymour Company.

3. As to orders or contracts hereunder taken, The Seymour Manufacturing Company will turn over for production at the plant of The Derby Manufacturing Company one-half thereof. The volume of such orders or contracts, however, amounting to such that the delivery requirements thereunder to be made from time to time are in excess of the Seymour Company's present weekly capacity, or any capacity, substituted therefor, or partly so, for the manufacture of said bands the surplus requirements from time to time so in excess will be turned over to the Derby plant for production, the said Seymour Company's present capacity being fixed as 200,000 pounds finished bands weekly.

4. In making the division of production to be made on orders and contracts equally as above between the two companies, it is to be based on the total tonnage in finished bands, and on any total order for 9.2″ bands being turned over for production in the Derby plant, the Seymour Company is to be allowed out of any preceding or succeeding order to take over the tonnage to be produced in finished bands that would equal any quantity of 9.2″ that may be so turned over in entirety to the Derby plant, the idea being that up to the limitation on capacity provided in preceding paragraph, the production in finished tonnage is to be divided equally.

5. The Seymour Company will provide and finance the copper required for that part or the whole of any contract or order taken by it that hereunder is to be produced in the Derby plant, and will specify and have scheduled for delivery at the Derby plant the copper that may be so required to be converted hereunder into bands at the Derby plant, but it is specifically understood that the Seymour Company, acting in good faith in instructing the scheduling of copper as above, shall not be responsible for non-delivery or delays in delivery thereof to the Derby plant from any cause whatsoever, beyond acts on their own part that may cause such delay.

6. The Derby Company receiving the copper will in good faith, produce, box and deliver the copper bands at times in quantities and as required under different orders and contracts, carrying out the shipping instructions supplied from time to time by the Seymour Company, and should there be delays in the delivery of copper, precedence in the manufacture of the bands shall be given by The Derby Manufacturing Company to such contracts as the Seymour Company directs.

At that time the defendant was indebted to the plaintiff, and this appeal presents a number of questions

It is specifically understood that The Derby Manufacturing Company acting in good faith in the production, boxing and shipping of the copper bands in accordance with contract requirements, will not be responsible for strikes, lockouts, breakdowns, non-delivery of copper or other causes beyond their control.

7. All copper provided by the Seymour Company hereunder will be at the market price of copper on the day of the making of any bid or price or acceptance, and that such market price may be determined, officials of the companies, before any such bid or acceptance is made, will fix upon the market price, and such price is hereinafter referred to as the "agreed market price."

8. All copper delivered to the Derby plant for manufacture will remain and be the property of the Seymour Company, but for purposes of accounting, all copper specified for the Derby plant will be billed against the Derby Company at the agreed market price of copper on the day of making bid for contract (plus increase, if any, that may have to be paid for securing of copper in form specially required), or should copper on the day of acceptance of such bid be higher, then the billing will be at the agreed market price on the day of acceptance or closing the contract, with addition, if any, as above; and the Derby Company for all copper delivered to its plant in respect of such contract, is to convert same into the bands for which same is supplied, and is to make return to the Seymour Company of an equal quantity of copper (less a manufacturing loss to be allowed the Derby Company not to exceed one-quarter of one per cent), in the form of copper bands so produced and shipped as heretofore set out, the heavy scrap therefrom and in turnings, and as to any deficiency in returning the quantity of copper supplied, less loss, if any, as above, at the Seymour Company's option, is to pay cash for the quantity not so returned. The copper returned in finished bands is to be not less than fifty per cent of the copper furnished therefor; and scrap and turnings are to be shipped and returned forthwith after production in manufacturing, and the copper being so returned from the Derby plant, the Derby Company will be credited as to each pound of copper bands shipped with the billing price to them of the copper for such contract, and will be credited on the copper returned to the Seymour Company's plant in form of heavy scrap at the said agreed market price less one (1) cent per pound, and on copper returned in form of turnings at agreed market price less two (2) cents per pound, and the freight to refinery designated. Forthwith following the completion of any particular order or contract, the necessary adjustment, returns, and payments will be made in respect thereof by each company to the other except as hereinafter set out.

9. On the basis of a base toll charge on orders or contract (i. e. that

arising out of the business relations of the parties. These questions may be conveniently arranged for discussion under the following heads:—

part of the contract price for copper bands above the billing price to the Derby Company on copper therefor) of 15 cents per pound, the Derby Company will be entitled to receive from the Seymour Company the toll charge of eleven (11) cents per pound, and on all contracts or orders taken at a price that would be either lessening or an increasing from the said base toll charge, the participation of the companies in the total toll charge will be proportionately as their interest appears in the said base toll charge increased or decreased.

10. The Derby Company will be entitled to receive and be paid its toll by the Seymour Company forthwith upon the Seymour Company receiving payment for the copper bands.

11. In the accounting between the companies arising out of their relations heretofore, there are owing and due by the Derby Company in respect of the charge of $1\frac{3}{4}$ cents per pound on the light scrap returned to the Seymour Company up to January 22, 1917, and on interest and wages (settled on) the sum of $18,938.22, payment of which will be extended for ninety days from February 1, 1917, the Derby Company making payments of not less than $1,000 weekly after March 1, 1917, and the Derby Company will forthwith deliver the balance of copper bands and scrap copper still coming to the Seymour Company under the contracts heretofore between the said companies, and each company hereby relinquishes and abandons any and every claim for *unliquidated* damages arising out of their relations or through failure (if any) on the part of either in any way in the carrying out of respective obligations under any prior agreements, engagements and arrangements in writing, through letters, or verbal, hereto, between the companies; and as to all relations between the companies on contracts and orders for production and supplying of copper bands hereafter, all previous agreements and arrangements are superseded by this agreement.

12. The Derby Company having bought some 850,000 pounds of copper specified as to the amount thereof in billets for 9.2″ copper bands, it is agreed that for the first contract taken hereunder for 9.2″, the Seymour Company is to take over this supply in the same manner as though it were being purchased by them from refinery for such contract as to such part thereof as may be required at the Derby Company's purchase price therefor, and as to any part not yet specified, the same may be specified by the Seymour Company for other sizes.

13. The Derby Company having already taken a contract for the production of 300,000—6″ copper bands from The Chase Rolling Mills Company, of Waterbury, it is agreed that such contract will come under this agreement except as to the following variation: The

(1) Whether the contract is illegal on its face or because it was entered into for the purpose of restraining competition.    (2) On what terms is the plaintiff

Seymour Company providing the copper required as to 150,000 pounds at 30½ cents per pound, as to 350,000 pounds at 29½ cents (this being in satisfaction of 500,000 pounds of copper which under a previous agreement was to be delivered to the Derby Company) as to the balance, if any, as may be later agreed on, work to be done entirely in the Derby plant without any effect on division of work on contracts hereafter taken. The Seymour Company is to receive 2¾ per pound on the finished bands delivered and paid for. From payments being received for the delivered bands, amounts are to be turned over to the Seymour Company to the value of the copper in each shipment plus the said 2¾ cents per pound.

14. Disputes arising between the companies hereunder shall be settled by arbitration, the Derby Company selecting one arbitrator, the Seymour Company the other, and if these two fail to agree they shall select a third arbitrator, and the arbitrators' award shall be binding upon the companies, but the question of dissolution of this agreement shall not be the subject of arbitration.

15. This agreement shall continue in force until terminated by either company giving to the other thirty days' notice in writing, and agreement will at the expiration of such time be terminated, but such termination shall not apply to any business in hand, nor business being negotiated, nor any new business coming to the notice of either party previous to the expiration of said time, and anything that either company may be owing the other at the time of such notice will within ten days after termination hereof become due and payable.

16. The words "Seymour Company " and the words "Derby Company " used herein will be read "The Seymour Manufacturing Company " and "The Derby Manufacturing Company " and extended to apply to the successors and assigns of the respective companies.

17. *The parties hereto agree that except for the items for light scrap returned and interest and wages, settled upon in paragraph 11 at $18,938.22, no items of book account or items commonly charged upon book which the Seymour Company has against the Derby Company shall in any way be affected by this agreement.*

18. *It is further agreed that the said Derby Company will pay and account to the said Seymour Company for the sum of $90,000 lent and advanced by the Seymour Company to the Derby Company on or about the 26th day of January, 1917; and it is further agreed that the Derby Company will pay to the Seymour Company the sum of $199.40 for the motor sold by the plaintiff to the defendant on or about the 26th day of January, 1917; and it is further agreed that the Derby Company will pay to the Seymour*

required to pay for copper taken over in partial performance of paragraph 12.   (3) The construction of paragraph 13 and the claims arising under the Chase 6" contract.   (4) The division of tolls under the Chase 8" contract.   (5) Claims arising from the rejection and return of defective bands made by defendant.   (6) The quantity of copper remaining unaccounted for by the defendant.   (7) The proper amount of charges for differential on scrap returned.   (8) The claim for damages for delay in returning scrap.   (9) Whether the court erred in giving the judgment for the plaintiff on the first count of defendant's counterclaim. (10) Whether the court erred in giving judgment for the plaintiff on the second count of defendant's counterclaim.

*Edward A. Harriman*, with whom was *Harold E. Drew*, for the appellant (defendant).

*Edmund Zacher*, for the appellee (plaintiff).

BEACH, J.   *First.* Whether the contract, Exhibit A, is illegal on its face or because it was entered into for the purpose of restraining competition.

Exhibit A purports to be a contract to coöperate in

---

*Company the sum of $836.45 for goods, wares and merchandise sold by the said Seymour Company to the Derby Company; and it is further agreed that the Derby Company will pay or account to the Seymour Company for the sum $2,031.06 credited by the Seymour Company to the Derby Company for toll on bands subsequently returned as an over shipment.*

In witness whereof the companies have hereinto caused their names and their corporate seals to be affixed duly attested by their proper officers hereto duly authorized to bind them.

THE SEYMOUR MANUFACTURING COMPANY,
(Signed)   G. E. MATTHIES.
THE DERBY MANUFACTURING COMPANY,
(Signed)   J. WILLMANN.

Witness H. F. HUNTER.

the construction of copper driving bands, on the basis of the Seymour Company providing the copper and the Derby Company manufacturing the bands therefrom. Each party engaged to fully inform the other of any impending business, and, if it is proposed to bid for or accept any such business, and if the Seymour Company can furnish the copper, and if the parties agree on the market price of the copper and on the contract price for the bands, then the Seymour Company is to make the bid or acceptance in its own name, and turn over one half of the tonnage of orders so taken to the defendant for production. The defendant agrees to take the plaintiff's copper, to convert it into bands, and to account for the scrap. The difference between the market price of copper per pound and the contract price of bands per pound is called, in Exhibit A, the "toll," and is to be divided in the proportion of eleven parts to the Derby Company and four parts to the Seymour Company.

The defendant claims that the contract restrained competition because the parties proposed to agree on the price of bands. The contract contains no present agreement on prices for any purpose. It does contain an agreement to agree on the price at which some bands shall be sold. This is not, however, for the purpose of preventing one party from underselling the other in the open market. It relates only to orders or contracts brought within the contract, Exhibit A, by the specific agreement of the parties in each case; and therefore applies only to orders which must be or may be, according as the contract is construed, turned over in part to the defendant for production. Of course, the defendant cannot bid against the plaintiff for any contract and at the same time agree to act as plaintiff's bailee for hire in assisting to fill it. But this does not make the bailment, or the agree-

ment as to the terms on which such bailments will thereafter be undertaken, illegal, either at common law or under the Sherman Act.

It is also claimed that the contract is illegal because the defendant agrees not to make any bid or take any order for bands. We find no prohibition in the contract against the defendant accepting business on its own account. The contract goes no further than to provide that so far as the parties may be able to agree on prices the defendant is to coöperate in production by acting as plaintiff's bailee, and the bid or acceptance is to be in the Seymour Company's name. It must follow that if they cannot agree on the price at which any order will be accepted for coöperative production, either party may compete for it on its own account. The court finds that such was the intention of the parties in formulating Exhibit A, and the defendant's brief accepts that construction of the contract when it contends that the Chase 8″ contract was not brought under Exhibit A, because it was taken in defendant's name and because prices were not agreed on in advance.

The claim that the contract was entered into for the purpose of restraining competition between the parties is refuted by the findings.

Its origin and basis are sufficiently explained by the findings of the court that the plaintiff did not have productive capacity to fill its orders, and that the defendant had surplus capacity for production, but did not have funds or credit enough to carry on business on its own account.

*Second.* On what basis is the plaintiff required to pay for 650,000 pounds of copper taken over under paragraph 12?

In partial execution of the provisions of paragraph 12, plaintiff took over 650,980 pounds of copper, which

the defendant billed to the plaintiff at the average contract price to the defendant of the entire supply of 850,000 pounds; to wit, 30.8 cents per pound. The plaintiff credited the defendant with the amounts of bills thus rendered, in the aggregate sum of $200,501.84. In the course of the trial the plaintiff found out that the particular shipments of copper so delivered to it had cost the defendant only $194,588.10, less a discount of one half of one per cent for cash leaving the net cost to the defendant of these particular shipments of copper $193,615.16, or $6,886.68 less than the amounts billed and credits given. In stating the account the trial court allowed the plaintiff to reduce this credit by the amount last named, and the question now presented is whether under the terms of paragraph 12 the plaintiff is to take over this copper at the prices paid for the particular shipments delivered to it, or at the average price of the whole supply. The relevant portion of paragraph 12 is as follows: "It is agreed that for the first contract taken thereunder for 9.2″, the Seymour Company is to take over this supply in the same manner as though it were being purchased from refinery for such contract as to such part thereof as may be required at the Derby Company's purchase price therefor, and as to any part not yet specified, the same may be specified by the Seymour Company for other sizes."

The manifest intention is to put the plaintiff in the position of taking over all this copper as though it were being bought by plaintiff from refinery at the Derby Company's purchase price. The parties might have undertaken to do this by agreeing that the average price of all shipments should be applied to each delivery. But they preferred to agree that the Derby Company's purchase price should be applied to "such part thereof as may be required," for the first 9.2″ con-

tract, and that the balance might be specified for other sizes. This 650,980 pounds is in fact the part thereof which was required for the first 9.2″ Morgan contract, and by the express terms of Exhibit A the plaintiff is entitled to take this particular part of the supply over at the Derby Company's purchase price.

It is urged that the Seymour Company would never have agreed that the Derby Company might unload the highest priced shipments on it, and retain the rest. But if the contract had been carried out according to the intention of the parties, the entire supply would have been taken over, and then it would make no difference to either party in what order the shipments had been taken over, or whether credit had been given for each shipment at the purchase price of each, or at the average price of all. It is only because the complete performance of paragraph 12 was interrupted, for reasons which will appear hereafter, that it becomes material to inquire whether each particular shipment should be charged at its purchase price or at the average price of the whole supply.

We think, however, that the plaintiff is not entitled to the benefit of the one half of one per cent discount for cash. Although the findings indicate that the defendant used money borrowed from the plaintiff, or owed to the plaintiff, to pay for the several shipments of this copper, it has been charged with interest on these sums, and it was compelled to carry the copper until taken over. The result is that $972.94 should be deducted from reduction of credit allowed by the court.

*Third.* The construction of paragraph 13 and the claims arising under the Chase 6″ contract.

(a) Defendant in its cross-complaint asked that paragraph 13 be reformed by inserting the words "in bands," so that the plaintiff's agreement to furnish

copper should read as follows: "The Seymour Company providing the copper required as to 150,000 pounds (in bands) at 30½ cents per pound, as to 350,000 pounds (in bands) at 29½ cents per pound." Reformation was denied, and defendant now seeks to reach the same result by claiming that the court erred in not so construing the contract.

We think the construction proposed by defendant is inconsistent with the bracketed words of explanation next following the words above quoted; to wit, ("this being in satisfaction of 500,000 pounds of copper which under a previous agreement was to be delivered to the Derby Company"). The previous agreement was to furnish 500,000 pounds of copper and not to furnish copper for 500,000 pounds of bands, and as the new agreement is in satisfaction of the old, it calls for the same amount of copper.

(b) At what price should defendant account to the plaintiff for certain copper of the plaintiff appropriated by the defendant to the Chase 6″ contract without making any agreement on its price?

The defendant reported that it had made 288,283 bands under the contract. In making these it used not only the 500,000 pounds of copper furnished by the plaintiff at the agreed special prices, but also used 180,499 pounds of other copper belonging to the plaintiff which was in the defendant's possession. Acting on the theory that the plaintiff was bound to furnish copper for 500,000 pounds in bands at the specified prices, it credited plaintiff with 30.5 cents only for this copper, although its market value when appropriated was 35 cents a pound. The court increased this credit from 30.5 cents to 35 cents a pound. The allowance was proper. Defendant appropriated the plaintiff's copper to the contract without agreeing on its price, and the plaintiff has assented to the appropri-

ation and relies on the implied promise of the defendant to pay what the copper was reasonably worth. We cannot say that this copper was not reasonably worth its market value at the time it was taken.

(c) Plaintiff's claim for toll on bands delivered and paid for under the Chase 6″ contract, but not reported by defendant.

The Chase 6″ contract, though described in paragraph 13 as for 300,000 bands, carried an option expiring February 1st, 1917, for an additional 50,000 to 75,000 bands. This option was exercised January 30th, 1917, to the extent of 62,113 bands. The Chase contract was carried out by the defendant shipping and billing the bands direct to the Chase Company, and reporting to the plaintiff the number of bands so shipped and paid for. Defendant concealed the fact that the option above mentioned had been exercised. It reported and accounted for only 288,283 bands, and did not report 73,830 bands which were in fact delivered and paid for. Plaintiff did not furnish the copper for these unreported bands, but it was at all times ready and willing to furnish all copper required for the Chase 6″ contract, and was diligent in attempting to find out whether the defendant needed additional copper to complete the contract. The defendant used for these bands what remained unspecified of the 850,000 pounds of copper described in paragraph 12.

The court did not err in allowing the plaintiff its agreed toll on these unreported bands. The Chase contract was by the express terms of paragraph 13 brought under Exhibit A, and therefore became a co-operative transaction. The plaintiff had the right to assist in its performance by furnishing copper at agreed prices, and the right to receive its agreed toll on all bands delivered and paid for. Conversely, the defendant had no right to resort to other sources of

copper supply in order to make itself the sole bene-
ficiary of the contract.   Defendant claims that by the
terms of paragraph 13 the agreed toll is payable only
in case the plaintiff furnishes the copper, but the an-
swer is that the plaintiff's readiness and willingness to
furnish copper is in law a sufficient performance of its
agreement to furnish it, as against the defendant who
has wrongfully prevented it from doing so.

(d)  It is also urged that the plaintiff cannot recover
the agreed toll, but ought to have stated its claim as a
claim for damages resulting from the defendant's
failure to use plaintiff's copper.   If it had done so,
the one definite element of such damage would have
been the loss of toll, and we do not see why the plain-
tiff may not waive any other possible elements of
damage.   We think, for example, that the plaintiff
might have asked the trial court to assume that if the
defendant had used the plaintiff's copper, it would,
under the terms of Exhibit A, have taken it over at
the market price and accounted for the scrap.   On
that assumption it is hard to see why the plaintiff is
not entitled to its agreed toll as damages.

For reasons above stated the court did not err in
giving judgment for the plaintiff on the ninth count
of the defendant's counterclaim.

*Fourth.* The division of toll under the Chase 8″ con-
tract.

The question here is whether the division of toll
under this contract is controlled by Exhibit A, or by a
different proposition contained in a letter written by
the defendant to plaintiff on February 14th, 1917,
which, by inadvertence, as the court finds, was not
answered until March 17th.   Defendant claims that
the court erred in apportioning the toll according to
Exhibit A for the reason that the Chase 8″ contract
was not controlled by Exhibit A:   (a) because there

was no mutual agreement as to prices as required by paragraph 7; (b) because the plaintiff's delay in answering the letter of February 14th amounts in law to an acquiescence in the division of toll proposed therein.

(a) The finding of facts shows that the parties did agree in advance on the market price of copper, and on the price of bands for the Chase 8″ contract, for it is found that the letter, Exhibit 43, dated February 7th, 1917, was dictated by Mr. Matthies, the active representative of the plaintiff, in the presence of Mr. Willmann, the president of the defendant. This letter, therefore, though signed by the defendant only, in fact expresses the mutual agreement of the parties that the Chase Company is to furnish copper for this contract at 32 cents a pound, and "We would supply the bands at 45 cents, we to keep the scrap." The proposition thus agreed on between the parties was accepted by the Chase Company, and the order was filled on that basis. This is a substantial compliance with paragraph 7, and brings the contract under Exhibit A.

(b) The defendant's subsequent letter of February 14th was, therefore, in legal effect, a proposition to rescind the agreement for division of toll already applicable to this contract under paragraph 9 of Exhibit A, and to substitute a new apportionment in its place. That being so, the plaintiff was not bound to make any reply to it; and the plaintiff's delay in answering this proposal to make a new and different agreement, cannot operate to divest it of contract rights already fixed by Exhibit A.

*Fifth.* Claims arising from the rejection and return of defective bands made by the defendant.

(a) Plaintiff's claim to recover toll paid on defective bands returned.

These bands were made and shipped before the

execution of Exhibit A, under an order given by the American Locomotive Company to the plaintiff which was turned over to the defendant for production. And as the bands were shipped the plaintiff paid the defendant, or gave it credit for, the agreed toll. After the execution of Exhibit A a number of the bands were returned as defective, some of which were repaired by the defendant, and others finally scrapped on the defendant's admission that they were defective. The court allowed the plaintiff to recover the toll paid on bands afterward scrapped. Defendant appeals on two grounds: (1) that the claim is for liquidated damages for breach of contract committed before the execution of Exhibit A, and therefore released by paragraph 11 thereof; (2) that if not so released, the proper measure of damages is not the toll paid to the defendant, but the difference between the contract price for perfect bands and the market value of the defective bands.

(1) We think that the plaintiff's claim is twofold. It has paid the defendant by mistake for doing a specific thing which the defendant did not do; and in addition to that the defendant has negligently converted the plaintiff's copper into scrap. Assuming that the claim for damages to the plaintiff's copper has been released by Exhibit A, it does not follow that the defendant is entitled to retain money paid to it by mistake for work which it did not do. Defendant contracted to convert plaintiff's copper into bands according to specifications at an agreed compensation. It was paid as the bands were shipped. When the bands were rejected and returned, the American Locomotive Company charged back their contract price to the plaintiff, and the plaintiff charged back to defendant the toll paid to it when the bands were shipped. It is now agreed that the bands were worthless except as scrap, because the defendant had not performed

its contract and had not earned its toll, and the defendant is in the position of retaining money paid to it by mistake. In equity and in conscience the money ought to be returned, and the court did not err in so ruling. It also follows that the court did not err in measuring the amount of the allowance.

(b) Plaintiff's claim under the sixth count for damages for defendant's delay in authorizing it to scrap defective bands.

This refers to the same bands. It is a claim for damages due to depreciation in the market value of the bands as copper scrap, while the plaintiff was waiting for the defendant's permission to scrap them. The underlying question is whether the defendant was under any legal obligation to instruct the plaintiff as to their disposition. No satisfactory basis for such a legal obligation is suggested. None arises out of the relation of bailor and bailee, or out of any special provision of the contract in force at the time these bands were made. After they were rightfully rejected and returned, the sole title to the bands and the right to dispose of them at will was in the plaintiff. The defendant was not bound by law or contract to do anything more to the bands, although it might and did, with the plaintiff's permission, repair some of them, and to that extent it relieved itself from any claim for damages or for the return of tolls paid. It is not found that the plaintiff agreed for a valuable consideration to hold the bands in order to enable the defendant to inspect and repair; and if any such agreement can be inferred it would, in the absence of any stipulation to the contrary, involve no obligation on the plaintiff's part to hold the bands any longer than was necessary to give defendant a reasonable opportunity to inspect and repair. There is nothing in the correspondence which indicates that the parties then had

any different views as to their respective rights and obligations. On April 4th, 1917, the plaintiff wrote defendant that the bands were ready for inspection and asked it to act promptly, adding: "Copper is declining now and we do not wish to hold it and take a loss later on." This letter contains no suggestion that the defendant is to take any loss due to the declining market. On the contrary, it assumes that the plaintiff must bear it. It appears that after much delay the defendant inspected and condemned the bands, and on June 30th wrote, in answer to plaintiff's request for written authority to scrap the bands, "We have agreed that the bands that are now in Seymour are defective and therefore it is entirely up to you what is to be done with them." No doubt both parties felt it might be advantageous, in the event of any future controversy, to have the number and condition of these defective bands ascertained beyond dispute; and the plaintiff has had that advantage in the prosecution of its claim to recover tolls paid. The delay, so far as it was unreasonably prolonged, appears to us to have been due to the plaintiff's willingness to take a loss on the copper for the sake of securing the defendant's admission that the bands were defective. Defendant was under no duty to inspect or instruct as to the disposition of the bands, and plaintiff might have disposed of them at any time without violating any duty which it owed to the defendant. The court erred in allowing the plaintiff $1,219.23 damages under the sixth count.

*Sixth.* The plaintiff's claim for copper unaccounted for.

Plaintiff's bill of particulars claims that 183,473 pounds of copper was unaccounted for. The allowance by the trial court is based on the finding that 224,742 pounds remained unaccounted for, the bill of particu-

lars having been amended accordingly. Defendant claims that the plaintiff's recovery was limited to the amount originally stated in the bill of particulars, that the court erred in its method of stating the account, and that as to one item the court overcharged the defendant.

(a) Defendant's claim that plaintiff's recovery was limited by the original bill of particulars on the ground of account stated, and estoppel.

From time to time defendant made shipments of bands and scrap, reporting weights. Plaintiff did not question the weights reported, and the claim is that the acceptance of each memorandum or bill of lading stated the account between the parties as to each shipment, so that the total result cannot now be questioned except by attacking the correctness of some particular item. It is also claimed that the plaintiff is estopped because defendant continued to act in reliance on the plaintiff's tacit admission that each reported weight was correct.

There would be some force to these objections if the plaintiff had sought to reopen the whole subject without any specific reason for doing so. The finding, however, shows that in the course of the trial the defendant, after repeatedly evading the question, finally admitted that on April 12th, 1917, it had sold 242,022 pounds of scrap. There was also evidence that on another occasion it had sold from 46,000 to 60,000 pounds of copper.

Even taking into account 83,207 pounds of scrap produced from the only copper which the defendant itself owned, it was impossible that the defendant could have had on hand anything like 300,000 pounds of copper for sale, unless its previously reported weights were materially wrong. In other words, the defendant's own admissions falsified the account stated, and

the plaintiff was then at liberty to restate the account as best it could and to amend its bill of particulars accordingly. It is hardly necessary to add that the plaintiff was not equitably estopped from doing so.

(b) Defendant's claim that under the pleadings plaintiff is limited by the original bill of particulars.

Plaintiff presented to defendant on April 30th, 1917, a bill for 183,437 pounds of copper unaccounted for, and included the same item in its bill of particulars. Defendant claims that the charge in the bill of particulars is for copper sold and delivered, which the plaintiff elected to sell to the defendant under the option reserved in paragraph 8 of Exhibit A, to require the defendant to pay cash for copper unaccounted for. The defendant then claims that the attempt to amend the bill of particulars so as to enlarge this item is of no effect because, up to the beginning of this action, the option reserved in Exhibit A had not been exercised except as to the amount originally stated, and no sale based on an option exercised after this suit was commenced can properly be included in the bill of particulars.

This argument assumes that the bill of particulars applies only to the common count for goods sold and delivered, and not to the common count on an account stated. It also assumes that the bill of particulars, Exhibit B, is annexed to the second count only of the complaint, whereas it is expressly made part of the first count also. And the first count specifically charges the defendant with having in its hands large quantities of copper unaccounted for, "to the amount in value of more than $60,000." Under this first count the item in question is distinctly presented as a claim for copper unaccounted for, and this item might of course be amended at any time in the discretion of the trial court.

(c) Defendant's claim that the court erred in the method of stating the amount.

This claim appears to be based on the theory already discussed, that the defendant's statements of the weights of copper scrap returned are to be taken as correct. Undoubtedly the defendant had accounted on paper for all of plaintiff's copper except the amount originally specified in the bill of particulars. But when that account was falsified by defendant's own admission, the court rejected the defendant's figures of scrap returned and built up a charge based on the finding that the defendant had sold 302,022 pounds of scrap of which 83,207 pounds was produced from the only copper which the defendant owned, and the balance from copper belonging to the plaintiff. Under the findings this is necessarily true. Evidently, the plaintiff's copper thus sold had not been accounted for, and after making some deductions and additions agreed on by the parties, the amount of copper so unaccounted for was ascertained to be 224,742 pounds. This method of stating the account appears to be unobjectionable.

(d) Defendant's objection to the finding that it sold 60,000 pounds of the plaintiff's copper to the American and British Company.

This finding is based on the defendant's admission that it took an order for 60,000 pounds of bands from the American and British Company, and used plaintiff's copper in filling it. There is evidence that this order was filled to the extent of 46,616 pounds, and the defendant claims that there is no evidence of any additional deliveries under this contract. Plaintiff's brief does not refer to any such evidence, and we have not been able to find any. We think the court inadvertently assumed that this entire order was filled. The amount of copper unaccounted for should be

reduced by 13,384 pounds. This copper was charged to the defendant at the rate of 33 cents a pound, and the sum of $4,416.72 should be deducted from the allowance for copper unaccounted for.

*Seventh.* The charge for differential on scrap returned.

Under Exhibit A the defendant was charged a differential of two cents a pound on light, and one cent a pound on heavy, scrap returned by 'it; and allowed a manufacturing loss of one quarter of one per cent on the copper furnished by plaintiff. Under the agreement in force prior to Exhibit A, the differential was 1¾ cents a pound for light scrap and nothing for heavy scrap, with no allowance for manufacturing loss. Defendant claims that the court erred in calculating the amount chargeable to defendant for differential on scrap returned: (a) because it ignored the fact that there was an agreed manufacturing loss; (b) because it treated any scrap not returned as having been made under the agreement in force before Exhibit A; (c) because it applied the rate provided in Exhibit A to all scrap made on orders affected by Exhibit A, regardless of whether or not any of that scrap was produced before the execution of Exhibit A.

(a) The first point is admittedly well taken. It applies only to scrap made after the execution of Exhibit A. And because the whole of the heavy scrap is recoverable in the ordinary course of manufacturing, the allowance of one-quarter of one per cent for manufacturing loss should be applied in reduction of the amount of light scrap on which a differential of two cents a pound is chargeable under Exhibit A. This correction is a matter of calculation from data which are of record.

(b) If the court erred in treating all scrap not returned as having been made under the old contract,

the error was harmless so far as the defendant was concerned; for it has been charged with only 1¾ cents instead of two cents a pound on the calculated amount of light scrap, and it has been charged nothing, instead of one cent a pound, on the heavy scrap.

(c) The court erred in treating scrap made under the American Locomotive Company order before January 29th, 1917, as chargeable at the rate provided for by Exhibit A. Paragraph 11 provides that "as to all relations between the companies on contracts and orders for the production and supplying of copper bands hereafter, all previous agreements and arrangements are superseded by this agreement." The word "hereafter" limits the application of Exhibit A to the production and supplying of copper bands after its execution, and the charge for differential on scrap produced under the American Locomotive Company order prior to the execution of Exhibit A should be corrected by applying the rate in force before January 29th, to wit: by applying the charge of 1¾ cents per pound on light scrap only, without allowance for manufacturing loss.

*Eighth.* The claim for damages for delay in returning scrap.

(a) Defendant claims that the plaintiff waived any damages for such delay by its conduct in accepting the scrap without objection when returned.

It is found that the plaintiff accepted the scrap when returned, and it is found that the plaintiff did not dispute the weights reported by the defendant as returned. But it is not found that the plaintiff accepted the scrap without objecting to the delay in returning it. On the contrary, it is found that both parties knew that the return of the scrap was of great importance to the plaintiff, in order to put it to use again as soon as possible and to avoid purchasing

additional copper. It also appears from the testimony that the failure to return scrap was the subject of repeated protests and interviews between the representatives of the parties, and resulted in the plaintiff putting a man in defendant's factory to weigh the scrap. The fact that the claim for consequential damages for such delay was not included in the original statement of claim presented to the defendant on April 25th, does not amount in law to a waiver of the claim. Plaintiff might be willing to waive a claim for consequential damages provided its book account was settled, and not otherwise. Moreover, if the original statement of claim be regarded as an offer, it was never accepted or acted on by the defendant. The trial court has found, not expressly but by necessary implication, that this claim has not been waived. Regarded as a question of fact, it is a finding based upon conflicting evidence. Regarded as a conclusion of law, we think it is not erroneous.

(b) Defendant claims that the court erred in allowing plaintiff to recover damages for delay in returning copper scrap, and in also allowing plaintiff to recover the value of scrap which was not returned at all.

The claim is that the plaintiff, by requiring the defendant to pay cash for the copper unaccounted for, released the defendant from any obligation to return it at any time, and "is now estopped by its own act in selling the copper to the defendant, from claiming that there was any breach of the defendant's obligation to return promptly the scrap so sold."

We see no basis for any claim of estoppel. It is a case of election of remedies. The real claim is that the plaintiff, by electing to require the defendant to pay cash for copper unaccounted for, has waived any right to recover damages for delay in returning it, and that the courts erred in enforcing two inconsistent claims

for damages in respect of the same copper. Assuming, without deciding, that the remedies were inconsistent, it does not appear that they were enforced in respect of the same copper. The only claim for damages for delay in returning scrap is that which is based on the finding that on March 7th the plaintiff was compelled, by reason of defendant's failure to return scrap, to buy 618,252 pounds of copper as a substitute for copper which the defendant was then holding back in violation of its contract. The difficulty with the defendant's claim of error is that the deficiency which compelled the investment of March 7th was made up long before the plaintiff elected on April 25th to require the defendant to pay cash for copper then unaccounted for. The exhibits show that between March 7th and April 5th (plaintiff having placed a man in defendant's factory to weigh the scrap), the defendant returned more than enough copper scrap to replace the 618,252 pounds of substitute copper bought by plaintiff. That put an end to the running of damages based upon the enforced temporary investment of March 7th, and no claim for damages on account of delay in withholding any other copper is made or allowed. Evidently the copper remaining unaccounted for on April 25th is not the same copper as that which was withheld on March 7th and returned before April 5th.

(c) Defendant claims that the court erred in measuring the damages for delay in returning scrap.

The assignment of error on this ground is well taken. The damages allowed are measured by the difference between the market value of the detained scrap on January 29th and the market price on March 7th of the substitute copper which the plaintiff was then compelled to buy. This is not the rule applicable to this case.

By a temporary wrongful detention of property

the owner is for the time being deprived of his right to use, enjoy and sell it, and his actual damages may vary according to the facts of the case. If engaged in the business of selling the property, his actual damage may be measured by the depreciation, if any, in market value during the detention. If he intended to exercise his right of ownership by using and enjoying the property, his actual damage may be measured by the value to him of its use and possession during the same period. *Brown* v. *Southbury*, 53 Conn. 212, 1 Atl. 819; *Cook* v. *Packard Motor Car Co.*, 88 Conn. 590, 92 Atl. 413. And if, in an action for breach of contract, it is alleged and proved that one anticipated consequence of the loss of use would be that the owner would be put to the expense of procuring a temporary substitute for the detained property, his actual damages include the net cost of procuring the substitute. For example, damages for the loss of use of an automobile may include the actual and reasonable cost of hiring another in its place. *Wellman* v. *Miner*, 19 Misc. Rep. (N. Y.) 644, 647, 44 N. Y. Supp. 417, 419.

It is alleged in the fifth count that by reason of the defendant's breach of its contract to return scrap forthwith, the plaintiff was compelled to go into the market and buy copper to take its place; and it is found that when the contract was executed both parties knew that the prompt return of scrap was of great importance, to enable the plaintiff to convert it into, or exchange it for, billet copper, and thus to avoid the necessity of buying additional copper. Thus a proper foundation is laid on this record for the recovery as special damages of any loss which the plaintiff may have suffered because it was compelled to buy 618,252 pounds of copper to take the place of scrap wrongfully detained by the defendant.

The detained scrap, or its legal equivalent has been returned. When it was all returned, all damages due solely to its detention ceased. Whether plaintiff suffered any damage arising from the fact that it was compelled to buy and carry substitute copper during the period of the detention, depends upon whether the temporary investment resulted in a loss, and if so, on the amount of the loss.

In stating the account to determine the fact and amount of such damage, the defendant is to be debited with the price of the 618,252 pounds of copper bought on March 7th, and credited with each shipment of scrap returned at the market price of billet copper on the day of its return. The difference in market value between scrap and billet copper is to be disregarded because the plaintiff has already been allowed its agreed differential on all scrap returned. When the whole 618,252 pounds has been so credited, the result of the temporary investment will be apparent, so far as profit or loss is concerned. The defendant is also to be charged with interest on daily balances. No new trial is necessary. The tabulations of current prices of copper and the dates and weights of shipments of scrap returned are on record, and will enable the damages to be reassessed with sufficient accuracy.

*Ninth.* Whether the court erred in rendering judgment for the plaintiff on the first count of defendant's counterclaim.

This counterclaim is for damages for cancellation of the balance of the uncompleted order for 70,000 8 inch bands received by the plaintiff from the American Locomotive Company and sublet to the defendant on January 13th, upon terms superseded on January 29th by Exhibit A. After the order had been partly filled and some time after the execution of Exhibit A, the American Locomotive Company cancelled the

balance of the order, and the plaintiff notified the defendant of the cancellation and directed it to stop making bands under the American Locomotive Company's order.

The trial court has found that the defendant acquiesced in the cancellation of the order, and that finding is conclusive unless it was made without evidence or unless it is inconsistent with the undisputed facts. The correspondence between the parties at the time the order was cancelled, shows that the defendant took the matter up directly with the American Locomotive Company, and at the date of its last letter (February 25th, 1917) was attempting and expecting to negotiate a settlement with the American Locomotive Company. We are not referred to, nor have we found, any testimony or exhibit in the record which shows that the defendant at that time made any protest against the plaintiff's action in stopping the production under the American Locomotive Company contract. It appears that the defendant did stop making bands under this order, and that it used some which were already on hand in filling the Chase 8 inch contract. The first intimation of any claim for damages on the ground of breach of the subcontract between the plaintiff and defendant, is in Exhibit JJJJ, mailed to plaintiff April 20th, 1917, the date when the contract was terminated. Giving due weight to that fact, we think that the finding of acquiescence was made upon conflicting evidence, and must stand.

*Tenth.* Whether the court erred in rendering judgment for the plaintiff on the second count of defendant's counterclaim.

This counterclaim is for damages on account of contracts taken by plaintiff which are alleged to have been concealed from the defendant and in which the

defendant was not allowed to participate. The claim relates to six orders of which no part was turned over to the defendant for production, and the practical question is whether the defendant was entitled under Exhibit A to have any of this business turned over to it for production.

Defendant claims that under Exhibit A it was entitled to have turned over to it one half of each order. Paragraph 4 provides that the division is "to be based on the total tonnage in finished bands," and it also provides that "on any total order for 9.2" bands being turned over for production in the Derby plant, the Seymour Company is to be allowed out of any preceding or succeeding order to take over the tonnage to be produced in finished bands that would equal any quantity of 9.2" that may be so turned over in entirety to the Derby plant, the idea being that up to the limitation on capacity provided in preceding paragraph, the production in finished tonnage is to be divided equally." Under this provision the Morgan order for 9.2" bands amounting to 246,868 pounds, was turned over in its entirety to the defendant on February 14th. Exhibit ZZZZ shows that no orders were split or divided between the parties, but that each order was placed in its entirety either with one plant or the other; and it thus appears that both parties understood that the division was to be based on the aggregate tonnage of all orders, and not on the tonnage of each order separately. The same exhibit shows all the orders received, and their division between plaintiff and defendant, and it shows that the net tonnage produced by the defendant was largely in excess of one half of the aggregate tonnage of all orders. Taking into consideration the uniform practice which the parties acquiesced in, of allotting orders in their entirety to one or the other plant, the defend-

ant got more than its share of the total tonnage and had no right to participate in any of these six orders taken over by the plaintiff.

The defendant had the right, under paragraph 2, to full information regarding these orders, and it does not distinctly appear upon the finding whether or not the plaintiff did give the defendant such information. The breach, if it were one, was *damnum absque injuria*. Looking at the order of time in which the various orders were allotted, it appears from Exhibit ZZZZ that the defendant had already been allotted more than its agreed share of the total tonnage of all orders, before any one of the six orders in question was taken by the plaintiff. It therefore had no interest in any of them under the contract.

There is error in part; the judgment is set aside and the cause remanded with direction to deduct $972.94 from the allowance for reduction in the credit in plaintiff's bill of particulars, for copper taken over under paragraph 12 of Exhibit A; to disallow the award of $1,219.23 for damages under the sixth count of the complaint; to deduct $4,416.72 from the allowance for copper unaccounted for; to revise the allowance for differential on scrap by deducting the agreed manufacturing loss from the light scrap on which a differential is chargeable under Exhibit A, and by calculating the differential on scrap produced under the American Locomotive Company order before January 29th, 1917, at the rate in force before the execution of Exhibit A; to reasses the damages for delay in returning scrap in accordance with this opinion, and after applying these corrections to the principal sum for which the judgment appealed from was rendered, to wit, $180,296.63, to render judgment for the plaintiff for the amount thus ascertained, with interest from April 30th, 1917.

In this opinion PRENTICE, C. J., and CASE, J., concurred.

WHEELER, J. (dissenting). I concur in the opinion of the court except as to that part which deals with the measure of damages treated under *Eight*, c, and as to that point, I concur in the dissent of MR. JUSTICE GAGER.

Measuring the damages by the cost of copper purchased on a fast-rising market, two to three months after defendant's breach in delivery, emphasizes the injustice, in this case, of the method of measuring the damages adopted by the majority opinion. I have not been able to find a reported instance where such a measure of damages has been adopted under substantially like circumstances. The opinion of the majority proceeds upon the theory that this measure is as if on an accounting, rather than upon a claim for damages for breach in delivery.

In addition, I think the plaintiff by its conduct waived any damages for delay in returning this scrap. It accepted the scrap without objection and without claim for damage for delay. It presented, prior to this action, a bill covering in greatest detail its entire claim, and this bill corresponded with its case as presented, and did not include reference to a claim for damages for delay in delivery of scrap. This item the trial court found to be $18,547.56, over one tenth of the judgment rendered. It began this action and continued it down to August 29th, 1918, without making claim in the pleadings or elsewhere for damages for delay in returning this scrap. It made this claim for the first time August 29th, 1918, in its substituted complaint. The record would seem to justify the defendant in its claim that the plaintiff never intended to make this claim at or prior to the institution of this action.

GAGER, J. (dissenting). There are two particulars in which I dissent from the conclusions reached in the majority opinion. The first is in *Two* of the opinion construing paragraph 12 of the contract. This paragraph in full is as follows: "The Derby Company having bought some 850,000 pounds of copper specified as to the amount thereof in billets for 9.2" copper bands, it is agreed that for the first contract taken hereunder for 9.2", the Seymour Company is to take over this supply in the same manner as though it were being purchased by them from refinery for such contract as to such part thereof as may be required at the Derby Company's purchase price therefor, and as to any part not yet specified, the same may be specified by the Seymour Company for other sizes."

I interpret this as being one entire contract relating to 850,000 pounds of copper at purchase price for the whole. This quantity was made up of different shipments to the Derby Company from the refinery at varying prices. The quantity to be taken over by the Seymour Company under this paragraph has no reference to the invoice quantities as shipped to the Derby Company. The Seymour Company was not to specify certain invoices, but simply copper out of an entire quantity of 850,000 pounds. The cost of the 850,000 pounds will be determined by the sum total of the various invoices from which comes the cost per pound, and then the cost of any part of the 850,000 pounds ordered will be determined by the average cost per pound which in fact was 30.8 cents. It further appears, that this average price was recognized by the plaintiff when it gave credit to the defendant for 650,980 pounds of copper at 30.8 per pound.

This construction avoids any difference between the parties as to the invoices to be selected as being for copper for a higher or lower price, and does not

hamper either party should the Seymour Company not take the entire quantity under the option part of the paragraph. The trial court construed the contract as what may be called a contract for invoices, and charged the defendant the difference between invoice prices and the average price per pound of the copper taken by the Seymour Company, amounting to $6,886.68 I think this whole charge, founded on the construction of paragraph 12 as a contract for invoices, was erroneous. I agree with the allowance of the cash discount in the majority opinion, amounting to $972.94.

The second point on which I dissent is covered by the discussion in *Eight*, c, in the opinion, and is as to the measure of damages for delay in returning scrap copper by the defendant to the plaintiff, under the allegations of the fifth count. The rule adopted in the opinion, if I understand it, is that inasmuch as the plaintiff had to go into the market and buy copper in substitution of that detained, the damages depend upon whether the temporary investment resulted in a loss. This theory of damages is based on intermediate purchase of copper by the plaintiff. The corollary obviously is that had there been no such purchase there would have been no damage.

Under the contract of January 29th, 1917, copper scrap was to be returned forthwith to the plaintiff. At the time of the contract, the defendant had on hand 662,420 pounds of scrap copper which it was the duty of the defendant to return forthwith. There were thereafter some deliveries, and also scrap accruing from manufacturing operations, with the result that on March 7th, 1917, plaintiff bought a large amount of copper at an increased price, of which 618,252 pounds would not have been purchased at that time had the defendant returned scrap according to contract. The

majority opinion bases the damage upon this fact. The detained scrap, or its equivalent, has been returned without objection by the plaintiff. Therefore, the question is not one of conversion. This scrap was all the time plaintiff's property, having lawfully come into the defendant's possession. The case is, then, simply one of unlawful detention of possession. The copper was for manufacture and sale, not for use. It was procurable upon the market at any time, and any other equal quantity of copper was an equivalent. In such case the universal rule appears to be that damages will be measured by the interest on the value of the property during the time of its detention, plus, in some cases, depreciation in market value. The cost of a substitute does not in such case enter into the equation. The case, except for the possibilities of depreciation, does not differ from delay in performance of an agreement to pay a specific sum of money on a time certain. The fact that the creditor, as a result of delay in payment, had to borrow at higher rates, is immaterial: the damage is the interest on the money detained.

In all cases interest may be recovered unless there is a recovery for loss of use. If the property is for sale, or for manufacture and sale, and depreciates while detained, this depreciation may be added. The plaintiff could have replevied this copper at any time. The measure of damages in such cases should control. The rule is stated in 23 R. C. L., p. 911, as follows: "In those cases where the property is recovered to the owner the damages are usually measured by interest and depreciation in value. In most cases interest on the value from the time of the wrongful taking is a proper measure. It will be, generally, in all cases where the property detained was merchandise kept for sale, grain and all other articles or property useful only for sale or consumption. In such cases, if the owner recovers the

interest on the value of his property from the time he was deprived of it, he will ordinarily have complete indemnity unless the property has depreciated in value, in which case the depreciation must be added to the interest on the value, taken as it was before the depreciation, and the two items will furnish the amount of the damage. This damage, together with the property or its value at the time of the trial, will give the owner as complete indemnity as the law is generally able to give any person seeking redress for a wrong."

In Sedgwick on Damages (9th Ed. Vol. 2) it is said, in § 536: "Where the goods depreciated in value or suffered injury during the period of detention, the successful party can always recover the amount of the depreciation in value as damages for detention." And in § 538: "Where property is held by the owner, not for continuing use, but for consumption or sale, it is evident that no compensation can be recovered for use of the property; yet he has suffered damage by the detention of the property from him. This damage, in cases where the value of the use cannot be recovered, is measured by interest on the value of the property detained. The presumption is that damages for detention are to be so measured." See, also, 2 Sedgwick on Damages (9th Ed.) § 633b. To the same effect see 34 Cyc. pp. 1561, 1562; *Ormsbee* v. *Davis*, 18 Conn. 555.

The theory of damage adopted denies any damage from the detention of copper prior to the date of March 7th, when it should have been returned forthwith after January 29th, and the damage is directed to be computed on the basis of the price of copper March 7th, and the price of the copper detained on March 7th at the dates when returned, it having been returned in various lots subsequent to March 7th with interest on balances of unreturned copper from March 7th to date of return. As I view the law, the matter of the intermediate pur-

chase set out as special damages in the fifth count is irrelevant. This leaves the fifth count as a claim for damages for detention as described in Exhibit E under this count, viz: "Loss on copper scrap held at Derby and not returned promptly in accordance with contract." The majority of the court rightly holds that the trial court was in error in assessing damages under this count. I think the majority opinion is erroneous as to the measure of damages, and that the true rule of damages under this count is interest on the value of the detained copper scrap from the time of its detention until returned, plus depreciation in value at the time of its return, if such there be.